AO 93C (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means | ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| The SUBJECT AIRCRAFT is a 2004 yellow-colored Robinson Helicopter, model R44 Clipper II, with Pop Out Floats, stripes down the side, bearing serial number 10277 and registration number N277MC | ) ) ) ) ) ) | Case No. 8:22-MJ-00346-DUTY |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:     Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to <u>18 U.S.C. § 3103a(b)</u>, I find that immediate notification may have an adverse result listed in <u>18 U.S.C. § 2705</u> (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:    <u>May 12, 2022, at 12:05 pm</u>      **DOUGLAS F. McCORMICK**

                                                             *Judge's signature*

City and state:     <u>Santa Ana, CA</u>                <u>Hon. Douglas F. McCormick, U.S. Magistrate Judge</u>

                                                                        *Printed name and title*

AUSA: Daniel Ahn (x3539), Daniel Lim (x3538), Melissa Rabbani (x3499)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

## Return

| Case No.: 8:22-MJ-00346-DUTY | Date and time warrant executed: 5/12/22   2:00PM | Copy of warrant and inventory left with: Left Inside aircraft |
|---|---|---|

Inventory made in the presence of : Ignacio Ramos

Inventory of the property taken and name of any person(s) seized:

See Attached Property Receipt

## Certification

I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date: 5/16/22

_Executing officer's signature_

Darrell Tvedt , FBI Special Agent
_Printed name and title_

**UNITED STATES DEPARTMENT OF JUSTICE**
**FEDERAL BUREAU OF INVESTIGATION**
Receipt for Property Received/Returned/Released/Seized

File # _____

On (date)  5/12/22 _____

item(s) listed below were:
- ☐ Received From
- ☐ Returned To
- ☐ Released To
- ☑ Seized

(Name)  Harry Sidhu - Robinson Helicopter R 44, Tail No N277MC

(Street Address)  Creative Rotorcraft Maint, 7000 Merrill Ave B110 C

(City)  Chino, CA

Description of Item(s): Paperwork from Left Footwell, Pilot Front seat:
- Registration, FCC Registration, Safety Letter, Medical Cert,
  Airworthiness Information, Insurance Information, Operating
  Permit.
- Paperwork from Right Footwell, Front seat: Document
  dated 9/24/21 "Weight/Balance"
- Paperwork from Left rear seat - Two Fuel invoices

Received By: _____  Received From: _____
           (Signature)                              (Signature)

## Table of Contents

I.   INTRODUCTION ..................................................................................................1

II.  PURPOSE OF AFFIDAVIT ................................................................................1

III. SUMMARY OF PROBABLE CAUSE..................................................................4

IV.  STATEMENT OF PROBABLE CAUSE ..............................................................5

    A.  SIDHU Elicits the Help of CW2 in an Effort to Fraudulently Register the SUBJECT AIRCRAFT Under an Arizona Address to Avoid California State Taxes ..............................................................................................5

        1.  CW2 Provides an Out-of-State Address to SIDHU..............................5

        2.  FAA and Escrow Records Confirm SIDHU's Fraudulent Use of the Arizona Address to Register the SUBJECT AIRCRAFT...............7

        3.  Amount SIDHU Defrauded from the People of the State of California ..............................................................................................10

    B.  SIDHU Shared Privileged and Confidential Information with the Angels During Stadium Sale Negotiations, Actively Concealed Same from a Grand Jury Inquiry, and Expects to Receive Campaign Contributions as a Result ..............................................................................12

        1.  Background Information on the Anaheim Angels Baseball Stadium Provided by Current and Former Anaheim City Employees and Elected Officials................................................12

        2.  SIDHU Installs Himself onto the City's Stadium Negotiating Team, Shortly After Which the Angels and Anaheim Announce a Deal for the Angels to Purchase the Stadium...............................................14

        3.  The Stadium Deal Is Deemed to Have Violated the Surplus Land Act by the State of California .............................................................16

        4.  SIDHU Covertly, and with the Intent of Concealing from the Negotiating Team and the Public, Passed Privileged and Confidential Information to the Angels to Assist the Angels in Their Negotiations with Anaheim...................................................17

        5.  SIDHU Has Attempted to Obstruct an Orange County Grand Jury Inquiry into the Angel Stadium Deal .............................................22

        6.  SIDHU is Alerted to the Existence of a Federal Investigation Into the Stadium Deal by CW2 .................................................................30

V.   TRAINING AND EXPERIENCE ON DIGITAL DEVICES ..................................33

VI.  TRAINING AND EXPERIENCE ON EMAIL ACCOUNTS................................35

VII. CONCLUSION ..................................................................................................40

## **AFFIDAVIT**

I, Brian C. Adkins, being duly sworn, declare and state as follows:

### **I.    INTRODUCTION**

1.      I am an investigative or law enforcement officer of the United States within the meaning of 18 U.S.C. § 2510(7), who is empowered to conduct investigations of, and to make arrests for, the offenses enumerated in 18 U.S.C. § 2516.

2.      I am a Special Agent with the Federal Bureau of Investigation ("FBI"), and have been so employed since June 2010.  I am currently assigned to a public corruption squad. During my employment with the FBI, I have participated in multiple investigations of public officials, including those involving bribery, extortion, mail and wire fraud, and obstruction of justice.  Many of these investigations have involved the use of informants and cooperating witnesses, and have required financial analysis.  My duties have included conducting covert investigations of public officials.  I have also conducted physical surveillance and have monitored electronic surveillance.  In addition, I have been trained on the investigation of public corruption and other white collar crimes.  In particular, I have been the affiant on multiple Title III wiretap affidavits, both in the Northern District of Illinois and the Central District of California.  The investigations resulted in indictments of multiple organized crime figures, an elected public official, and a real estate developer.

### **II.    PURPOSE OF AFFIDAVIT**

3.      This affidavit is made in support of applications for search warrants to search the following:

a.      The email account identified as harry@harrysidhu.com (the "SUBJECT ACCOUNT"), the contents of which are stored at the premises controlled by GoDaddy.com, LLC (the "PROVIDER" or "GoDaddy") located at 14455 North Hayden Road, Scottsdale, AZ

85260.[1][2]  The information to be searched is described in **Attachment A-1**.  This affidavit is made in support of an application for a warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A) and 2703(d)[3] to require the PROVIDER to disclose to the government copies of the information (including the content of communications) described in Section III of Attachment B.  Upon receipt of the information described in Section III of Attachment B, law enforcement agents and/or individuals assisting law enforcement and acting at their direction will review that information to locate the items described in Section I of Attachment B.  Attachments A and B are incorporated herein by reference.

        b.      A 2004 Robinson Helicopter, model R44 Clipper II, with Pop Out Floats, bearing serial number 10277 and registration number N277MC (the "SUBJECT AIRCRAFT"), which is described more fully in **Attachment A-2**.

---

[1] On approximately January 19, 2022, the PROVIDER was served with a preservation letter requesting that information associated with the SUBJECT ACCOUNT be preserved for 90 days pursuant to 18 U.S.C. § 2703(f).  On or about May 11, 2022, the PROVIDER was again served with a preservation letter requesting the same.

[2] Because this Court has jurisdiction over the offense(s) being investigated, it may issue the warrant to compel the PROVIDER pursuant to 18 U.S.C. §§ 2703(a), (b)(1)(A), (c)(1)(A).  See 18 U.S.C. §§ 2703(a) ("A governmental entity may require the disclosure by a provider . . . pursuant to a warrant issued using the procedures described in the Federal Rules of Criminal Procedure . . . by a court of competent jurisdiction") and 2711 ("the term 'court of competent jurisdiction' includes -- (A) any district court of the United States (including a magistrate judge of such a court) or any United States court of appeals that -- (i) has jurisdiction over the offense being investigated; (ii) is in or for a district in which the provider of a wire or electronic communication service is located or in which the wire or electronic communications, records, or other information are stored; or (iii) is acting on a request for foreign assistance pursuant to section 3512 of this title").

[3] The government is seeking non-content records pursuant to 18 U.S.C. § 2703(d).  To obtain the basic subscriber information, which does not contain content, the government needs only a subpoena.  See 18 U.S.C. § 2703(c)(1), (c)(2).  To obtain additional records and other information--but not content--pertaining to subscribers of an electronic communications service or remote computing service, the government must comply with the dictates of section 2703(c)(1)(B), which requires the government to supply specific and articulable facts showing that there are reasonable grounds to believe that the records or other information sought are relevant and material to an ongoing criminal investigation in order to obtain an order pursuant to 18 U.S.C. § 2703(d).  The requested warrant calls for both records containing content (see Attachment B paragraph II.10.a.) as well as subscriber records and other records and information that do not contain content (see Attachment B paragraph II.10.b.).

c.    An aircraft hangar operated by Creative Rotorcraft Maintenance, located at the Chino Airport at 7000 Merrill Ave, Chino, CA 91710, and believed to contain the SUBJECT AIRCRAFT, which is described more fully in **Attachment A-3.**

d.    The person of Harry SIDHU, who is more fully described in **Attachment A-4**.

e.    A cellular telephone, bearing IMSI number 310410255802059, phone number (714) 390-5505, registered to SRH Management Inc., PO Box 19019, Anaheim, CA 92817, the user of which is identified as "Harish Sidhu" at his residence in Anaheim, CA (the "SUBJECT PHONE"), which is described more fully in **Attachment A-5**.

4.    As will be described in further detail below, I believe there is probable cause that Harry SIDHU ("SIDHU") may have engaged in criminal offenses involving violations of 18 U.S.C. § 1346 (honest services fraud), 18 U.S.C. § 666(a)(1)(B) (theft or bribery concerning programs receiving federal funds), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1001, (false statements), 18 U.S.C. § 1503 (obstruction of justice), and 18 U.S.C. § 1512(b) (witness tampering) (collectively, the "Target Offenses").

5.    As a result of my personal participation in this investigation, my review of authorized intercepted communications over multiple Target Phones, reports made to me by other government employees, including FBI Special Agent ("SA") Joseph Nieblas, information obtained from cooperating witnesses, Anaheim City Council meeting content, and open source media articles, I am familiar with this investigation. On the basis of this familiarity, and on the basis of other information that I have reviewed and determined to be reliable, I declare that the facts contained in this Affidavit show that there is probable cause to believe that SIDHU is committing, and/or will continue to commit, violations of the Target Offenses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter. Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. SUMMARY OF PROBABLE CAUSE

6.     In 2019, the FBI gained the assistance of a cooperating witness ("CW1").[4]

Through CW1's cooperation, the FBI learned that the City of Anaheim was tightly controlled by a small cadre of individuals, to include SIDHU, a particular member of the Anaheim Chamber of Commerce ("the Chamber"), and others. The FBI initiated multiple Title IIIs, conducted interviews, and served a number of subpoenas. As a result of the investigation, the FBI was able to gain the cooperation of the Chamber employee ("CW2").[5]

---

[4] The FBI has been investigating CW1 since approximately 2018 for violations of federal criminal law to include 18 U.S.C. § 666 (theft or bribery concerning programs receiving federal funds), among others. In July 2019, I sought court authorization to intercept electronic and wire communications over CW1's phone. I was granted Title III authorization from the court and intercepted electronic and wire communications over CW1's phone from approximately June 24, 2019 through July 23, 2019. On October 28, 2019, CW1 was arrested, pursuant to a complaint, for violating 18 U.S.C. § 666. CW1 was interviewed on the same day as CW1's arrest, and CW1 subsequently agreed to cooperate with the FBI in this investigation. The complaint was dismissed without prejudice at the request of the government. Based on my interactions with CW1, and the interactions of other agents with CW1, particularly FBI SA Joseph Nieblas, I believe that CW1 has lacked candor at times during CW1's assistance in this investigation. For example, I believe CW1 lied to FBI SAs during CW1's interview on October 28, 2019. I also believe CW1 has omitted material facts to investigators throughout CW1's cooperation with the FBI, including additional instances where CW1 has offered to pay bribes to elected public officials. However, the FBI has relied on information provided by CW1 in instances where such information has been deemed credible by way of corroboration. CW1's counsel has indicated to the government that they wish to reach a resolution in this matter. Based on the government's interaction with CW1 and CW1's counsel, I believe CW1's motive for cooperating in this investigation is to receive leniency for the federal criminal violation CW1 was originally arrested for, as well as other possible criminal conduct. The government has not made any promises of leniency to CW1 or CW1's counsel. As of April 11, 2022, CW1 has no known criminal history.

[5] The FBI has been investigating CW2 for violations of federal criminal law to include 18 U.S.C. § 1014 (false statement to a federally insured financial institution), 18 U.S.C. §§ 1341, 1346 (honest services fraud), 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. §§ 1956, 1957 (money laundering), 18 U.S.C. § 1344 (bank fraud), and fraudulently obtaining a loan under the Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"). Additionally, the Internal Revenue Service ("IRS") has been investigating CW2 for tax-related violations. Based on the government's interaction with CW2 and CW2's counsel, I believe CW2's motive for cooperating in this investigation is to receive leniency for the criminal conduct for which CW2 is currently being investigated. The government has not made any promises of leniency to CW2 or CW2's counsel. The government initially filed a forfeiture complaint and lis pendens on a home CW2 purchased through false and fraudulent means; however, the complaint has been dismissed and the lis pendens has since been rescinded pending CW2's ongoing cooperation. SA Nieblas and I, at times, believe CW2 may have withheld information pertaining to other potential criminal activity. As a result, I have made reasonable attempts to independently corroborate the information CW2 has provided relative to the two schemes described herein. Based on the independent corroboration we have been able to collect, I believe CW2 has been truthful as to the schemes described herein. As of April 11, 2022, CW2 has no known criminal history.

7. Subsequent to CW2's cooperation, the investigation to date has developed probable cause to believe the following: (1) SIDHU has engaged in a scheme to defraud the people of the State of California ("California"), the people of the State of Arizona ("Arizona"), and the Federal Aviation Administration ("FAA") by knowingly, intentionally, and fraudulently registering the SUBJECT AIRCRAFT under an Arizona residential address in an effort to avoid costs associated with registering the SUBJECT AIRCRAFT under SIDHU's actual address in California; and (2) SIDHU is engaged in an ongoing scheme to commit honest services fraud by sharing confidential information with representatives from the Los Angeles Angels Major League Baseball team ("the Angels") regarding negotiations related to the City's sale of Angel Stadium with the expectation of receiving a sizeable contribution to his reelection campaign from a prominent Angels representative. Furthermore, I believe SIDHU's actions in furthering this scheme have directly resulted in the withholding of information from an Orange County Grand Jury and an Orange County Superior Court Judge in a civil matter related to the sale of the stadium.

8. Furthermore, I believe SIDHU has committed the Target Offenses in furtherance of the aforementioned schemes through his use of the SUBJECT ACCOUNT and the SUBJECT PHONE, and that the fruits and instrumentalities of SIDHU's conduct are likely to be found within the SUBJECT ACCOUNT, the SUBJECT PHONE, and the SUBJECT AIRCRAFT.

## IV. STATEMENT OF PROBABLE CAUSE

**A. SIDHU Elicits the Help of CW2 in an Effort to Fraudulently Register the SUBJECT AIRCRAFT Under an Arizona Address to Avoid California State Taxes**

      1.    CW2 Provides an Out-of-State Address to SIDHU

9. On September 14, 2021, CW2 voluntarily provided consent to the FBI to search CW2's cellular telephone. Upon receiving consent, FBI SA Joseph Nieblas briefly took possession of the phone and downloaded the contents of CW2's phone, before returning the phone to CW2. Shortly thereafter, SA Nieblas reviewed the contents of CW2's phone and,

among other things, discovered text message communications between CW2 and SIDHU over the phone number associated with the SUBJECT PHONE.[6]

10.     During one particular text message exchange between CW2, SIDHU, and a resident of Arizona ("AZ Resident"), which occurred on or about October 28, 2020, CW2 sent a text message to SIDHU and AZ Resident that read, in part, "Good morning [AZ Resident] [SIDHU] would deeply appreciate use of AZ address..he is in the text.."  AZ Resident replied to the text message on the same day and provided AZ Resident's address located in Arizona.[7]  In response, SIDHU sent a text message back that read, "Thanks [AZ Resident]."  This text message exchange occurred with SIDHU using the telephone number known to be associated with the SUBJECT PHONE.

11.     Upon reviewing the text message exchange between SIDHU, AZ Resident, and CW2, SA Nieblas asked CW2 to provide context to the text exchange.  In response, CW2 advised that SIDHU was in the process of purchasing a helicopter during this time.  In fact, according to the Helicopter Purchase Agreement (which the FBI has received pursuant to this investigation, and which I have reviewed, among other documents received and reviewed as described in further detail below), SIDHU and the seller of the SUBJECT AIRCRAFT entered into the purchase agreement on October 28, 2020 (the same date as the text exchange outlined above), and the purchase agreement identified the Arizona address provided by AZ Resident in the text message exchange as SIDHU's "principal address."  According to CW2, SIDHU requested CW2's assistance in finding an out-of-state address with which to register the SUBJECT AIRCRAFT because SIDHU wished to avoid paying California sales tax as a result of his helicopter purchase.  In order to successfully avoid such costs, SIDHU needed to provide the Federal Aviation Administration ("FAA") with an out-of-state address for which to register the

---

[6] Based on information provided by CW2, consensual recorded telephone conversations CW2 has had with SIDHU, and Title III communications intercepted between CW2 and SIDHU, I believe the phone number, and therefore the SUBJECT PHONE, are in fact used by SIDHU.

[7] Based on a query of the law enforcement database accurint.com, which occurred on March 24, 2022, the AZ address appears to be the probable current address of the AZ Resident.

SUBJECT AIRCRAFT.  I understand that SIDHU's primary residential address is located in

Anaheim, CA.[8] and the location in which he primarily hangars the SUBJECT AIRCRAFT is

likely the Chino Airport located at 7000 Merrill Ave, Chino, CA 91710.[9]  Furthermore,

additional records searches did not reveal any connection between SIDHU and Arizona.[10]

2.    FAA and Escrow Records Confirm SIDHU's Fraudulent Use of the
Arizona Address to Register the SUBJECT AIRCRAFT

12.    Shortly after learning of the text message exchange between CW2 and SIDHU, I

contacted the FAA and the title company[11] handling the purchase/sale of the SUBJECT

AIRCRAFT to obtain registration and other information related to SIDHU's purchase of the

SUBJECT AIRCRAFT.

13.    Among the documents I obtained from the FAA and subsequently reviewed was a

document titled, "UNITED STATES OF AMERICA - DEPARTMENT OF

TRANSPORTATION Federal Aviation Administration - Mike Monroney Aeronautical Center

AIRCRAFT REGISTRATION APPLICATION" (the "Registration Application").  The

Registration Application reflected the SUBJECT AIRCRAFT as the subject of the application --

identifying the SUBJECT AIRCRAFT's registration number, manufacturer, model number, and

serial number.  The name of the applicant submitting the Registration Application was reflected

as "HS Sidhu," and the phone number reflected in the application was the cell phone number

associated with the SUBJECT PHONE.

14.    Located further down the document is a section for: "MAILING ADDRESS

(Permanent mailing address for first applicant on list.)."  In this section, SIDHU entered the

Arizona address provided to him by AZ Resident.  Located further below, but just above the

signature block of the Registration Application, is a legal section that reads:

---

[8] According to accurint.com, last visited on April 5, 2022.

[9] Based on observations conducted during surveillance described in further detail below.

[10] According to accurint.com, last visited on April 28, 2022.

[11] According to a representative from the title company, at all times during the transaction involving the SUBJECT AIRCRAFT, the title company and its representatives were located outside of the State of California, specifically, in and around Oklahoma City, OK.

7

ANY AND ALL SIGNATORIES OF THIS APPLICATION
MUST READ THE FOLLOWING AND UNDERSTAND THAT,
BY APPLYING A SIGNATURE TO THIS DOCUMENT, THEY
ARE SUBJECT TO THE REFERENCED STATUTES AND
ASSOCIATED PENALITES.

I hereby certify that the information provided herein and in any
attachments to the application for aircraft registration is true,
accurate and correct to the best of my knowledge and belief.  I
understand that the information provided by me will be relied on
by the FAA administrator in his/her determination of qualification
for aircraft registration.  I understand that whoever, in any matter
within the jurisdiction of any department or agency of the United
States knowingly and willfully falsifies, conceals or covers up (by
any trick, scheme or device) a material fact or who makes any
false, misleading or fraudulent statements or representation or
entry, may be fined up to $250,000 or imprisoned not more than
five (5) years or both (18 U.S.C. Sections 1001 and 3571).  I
understand that, should I intentionally provide any inaccurate or
false information, registration of the subject aircraft may be
revoked.

15.     Immediately following the admonishment is the signature section, where it

appears SIDHU signed the Registration Application on November 10, 2020.  Furthermore, the

signature section on SIDHU's Registration Application indicates that SIDHU signed the

document via DocuSign.  Based on my training and experience, I know that it is common for

legal documents, such as the purchase and sale of real estate and other assets, to utilize the

services of DocuSign, which is a software company that allows parties to transactions to virtually

"sign documents anywhere from any device."[12]  I also know it is common for DocuSign

documents to be sent electronically, often times via email.  Furthermore, according to a

representative from the title company handling the sale/purchase of the SUBJECT AIRCRAFT,

SIDHU was represented by a broker throughout the transaction, who provided the title company

with the executed DocuSign documents identified above.  The title company representative

further advised that the broker was located in St. Augustine, Florida and on or about November

4, 2020, the title company (located in Oklahoma) received an email from the broker (located in

---

[12] According to https://go.docusign.com, last visited on April 5, 2022.

8

Florida) containing the DocuSign documents related to the purchase/sale of the SUBJECT AIRCRAFT.

16. I believe SIDHU likely used the SUBJECT ACCOUNT to accept, sign, and send the DocuSign documents to his broker located in Florida because SIDHU used the SUBJECT ACCOUNT to communicate with the title company during the purchase of the SUBJECT AIRCRAFT (explained in further detail below). I also believe that SIDHU caused fraudulent documents, in this case the Registration Application containing the AZ Resident's address, to be transmitted, via wire, across state lines when the broker, located in Florida, emailed the document to the title company located in Oklahoma.

17. On November 13, 2020, shortly after the sale of the SUBJECT AIRCRAFT had finalized, a representative from the title company handling the transaction sent an email to SIDHU at the SUBJECT ACCOUNT. The email to SIDHU read, in part, "We have received the Certificate of Registration on the [SUBJECT AIRCRAFT]. Please confirm the address as to where you would like for us to send the *hard card to be placed inside the [SUBJECT AIRCRAFT] for flying*" [italics added for emphasis].

18. On the same day, November 13, 2020, SIDHU replied from the SUBJECT ACCOUNT and wrote, in part, "Please send the hard copy to HS Sidhu P O Box 19019 Anaheim Ca 92817 Best HS Sidhu."

19. According to CW2, SIDHU is believed to principally hangar the SUBJECT AIRCRAFT at an airport located in Chino, CA. Based on information found on flightaware.com, the SUBJECT AIRCRAFT was recorded departing Chino Airport on January 19, 2022 and arriving back at Chino Airport on the same day.[13] Based on this information, on March 2, 2022, I conducted surveillance at the Chino Airport with other members of the FBI and a federal agent with the aviation branch of the United States Customs and Border Protection ("CBP"). Although the surveillance team was unable to locate the SUBJECT AIRCRAFT, we were able to elicit the cooperation of an individual employed at the Chino Airport ("the Chino

---

[13] According to https://flightaware.com, last visited on April 5, 2022.

Airport Employee"). On March 13, 2022, the Chino Airport Employee informed me that the

SUBJECT AIRCRAFT departed from the Chino Airport, flew within the vicinity of the airport,

and returned to the Chino Airport thirty minutes later. On March 16, 2022, the Chino Airport

Employee provided me with photos of the SUBJECT AIRCRAFT inside a hangar operated by

Creative Rotorcraft Maintenance ("CRM"), which the employee identified as the SUBJECT

AIRCRAFT's permanent hangar location.[14]

### 3.   Amount SIDHU Defrauded from the People of the State of California

20.   According to the California Department of Tax and Fee Administration

("CDTFA"), the use tax rate applied to the purchase of an aircraft is the same as the sales tax rate

and is based on where an individual principally hangars the aircraft.[15]   The CDTFA website

gives an example of this, which reads, "For example, if you live in Anaheim, California, but

keep your aircraft in Long Beach, California, you must pay tax at the rate charged in the city of

Long Beach."   Applying this rule to SIDHU's situation, even though SIDHU lives in Anaheim,

the SUBJECT AIRCRAFT is believed to be hangared in Chino, CA.   The CDTFA website

directs the user to a "Find a Sales and Use Tax Rate" webpage to calculate the sales tax rate.   By

inputting the Chino Airport address, the website calculates the sales and use tax rate at 7.75%.

By then applying the 7.75% sales tax to the purchase price SIDHU paid for the SUBJECT

AIRCRAFT ($205,000, as reflected in the title company documents), SIDHU owed the State of

California $15,887.50 in sales tax on the purchase of the SUBJECT AIRCRAFT.   According to

records received from the State of California on January 27, 2022, there is no record of the

SUBJECT AIRCRAFT being registered in California, nor has any payment related to the sale of

the SUBJECT AIRCRAFT been received by the State of California.

---

[14] According to the Chino Airport employee, who relayed a conversation he/she had with CRM, CRM stores multiple aircraft in the two hangars they operate at Chino Airport.   However, the aircraft, including the SUBJECT AIRCRAFT, are not assigned to a specific hangar.   Rather, the aircraft are arranged in either hangar as space dictates.   Therefore, the SUBJECT AIRCRAFT may be stored in either hangar on any given day.

[15] According to https://www.cdtfa.ca.gov, last visited on January 19, 2022.

21.     Conversely, according to the Arizona Department of Transportation ("ADOT"), "the Motor Vehicle Division Aircraft Registration Unit of ADOT determines the value of aircraft annually for tax purposes…[t]he tax rate is one-half of one percent (0.005) of the assessed value of the aircraft, but not less than $20."[16]  Applying the value of the aircraft at the time SIDHU purchased the SUBJECT AIRCRAFT (i.e., the purchase price of $205,000), the tax owed by SIDHU to the State of Arizona upon the purchase of the SUBJECT AIRCRAFT was $1,025. However, on January 19, 2022, I spoke with a representative from ADOT who informed me that there was no record of the SUBJECT AIRCRAFT being registered in Arizona, and no record of any sales tax payment from SIDHU regarding the SUBJECT AIRCRAFT.  I confirmed the same with the representative from ADOT on or about May 11, 2022.

22.     I believe, based on the foregoing, that SIDHU used the AZ address to register the SUBJECT AIRCRAFT with the FAA, doing so, in part, through the use of interstate wire communications using the SUBJECT ACCOUNT, when in fact he was required to use a California address.  Based on the foregoing, I believe he did so in order to avoid California state taxes.  Furthermore, based on my conversation with a representative from ADOT, it does not appear that SIDHU paid Arizona state taxes on the sale of the SUBJECT AIRCRAFT, and therefore defrauded not only the people of the State of California, but also the people of the State of Arizona.

23.     By intentionally registering the SUBJECT AIRCRAFT using the Arizona address provided to him by AZ Resident, SIDHU was able to unlawfully avoid paying approximately $15,887.50 in sales taxes he was otherwise required to pay to the State of California. Furthermore, SIDHU was able to successfully implement this apparent fraud scheme through his use of the SUBJECT ACCOUNT and the SUBJECT PHONE, and I believe that the fruits and

---

[16] According to https://azdot.gov, last visited on January 19, 2022.

instrumentalities of SIDHU's conduct will likely be found in the SUBJECT ACCOUNT, the SUBJECT PHONE, and the SUBJECT AIRCRAFT.[17]

**B.** **SIDHU Shared Privileged and Confidential Information with the Angels During Stadium Sale Negotiations, Actively Concealed Same from a Grand Jury Inquiry, and Expects to Receive Campaign Contributions as a Result**

1. Background Information on the Anaheim Angels Baseball Stadium Provided by Current and Former Anaheim City Employees and Elected Officials

24. Based on interviews conducted by the FBI through the course of this investigation, and based on information publicly available online, I have learned several aspects about the history, and other aspects, of Angel Stadium. Angel Stadium is located at 2000 East Gene Autry Way, Anaheim, CA 92806. Historically, the stadium and the land on which the stadium is located, has been owned by the City of Anaheim, while the Angels team itself has been privately owned by several entities and individuals throughout the years.

25. Prior to 1996, Gene Autry owned the Angels. During this time, the Angels leased the stadium from the City of Anaheim for approximately $4-5 million per year.

26. In 1996, Disney purchased the Angels and a new lease was signed, which resulted in the stadium being renovated, with Disney paying approximately $80 million in renovation costs, and the City of Anaheim paying approximately $30 million towards the endeavor. The lease term was 33 years (until 2029), but under the terms of the lease the Angels were allowed to terminate the lease after 20 years (in 2016) at their discretion. In addition to the renovations and length and severability of the lease, additional lease terms were as follows:

a. Angels must operate and maintain the stadium,

b. Angels keep all revenue from concessions, signage, and advertising,

c. Angels keep nearly all revenue from stadium ticket sales,

---

[17] As referenced in paragraph 17 above, SIDHU is required to maintain a hard copy of the SUBJECT AIRCRAFT's Certificate of Registration inside the SUBJECT AIRCRAFT. Therefore, I believe said Certificate of Registration is likely to be found inside the SUBJECT AIRCRAFT and that the registration will reflect the AZ address, thereby providing additional evidence of SIDHU's scheme.

        d.      Angels have the right to use all the parking lot space, and keep most parking revenue,

        e.      Anaheim receives $2 per ticket on ticket sales in excess of 2.6 million seats,[18]

        f.      Anaheim received two Platinum Suites, and,

        g.      The Angels agreed to have "Anaheim" in its team name.

27.     In 2003, Arturo (aka "Arte") Moreno ("Moreno") purchased the Angels from Disney. In doing so, Moreno assumed all responsibilities under the lease agreement entered into by the Angels under the prior ownership of Disney. In 2013, Moreno proposed a new lease between three parties: Angels baseball, the City of Anaheim, and a company believed to be controlled by Moreno called Pacific Coast Investors, LLC ("PCI"). The proposed lease terms were as follows:

        a.      PCI control of the stadium property for at least 66 years, or until 2079,

        b.      PCI's exclusive right and sole discretion to transfer the property,

        c.      PCI would have full discretion, control of, and all rights to develop, improve, or otherwise alter the property,

        d.      PCI would keep all revenue generated from the property,

        e.      PCI would receive tax rebates from Anaheim,

        f.      The Angels would keep all revenue from the stadium and occupy the stadium until 2057,

        g.      The Angels would have the option to terminate their lease in years 20, 27, or 34 of the lease,

        h.      The Angels would no longer be required to have "Anaheim" in their name,

        i.      The $2 per ticket threshold would be raised from 2.6 million seats to 3 million seats,

---

[18] One witness noted that ticket sales reached this volume only when the Angels made the World Series.

j.     The Angels would be allowed to terminate their lease for an additional three years (2017-2019),

k.     Anaheim would receive $1 in rent per year for the duration of the lease (66 years),

l.     Anaheim would receive one Angels luxury suite, 20 suite days, and 2,500 tickets to give away to guests and others, and,

m.     Anaheim would maintain the prestige of having a Major League Baseball team in the city.

28.     The lease proposed by Moreno as outlined above never came to fruition. As a result, the Angels sent a letter to the City of Anaheim on October 16, 2018, notifying the city that the Angels were terminating their current stadium lease with the city, thereby triggering new lease negotiations with Anaheim shortly thereafter.

2.     <u>SIDHU Installs Himself onto the City's Stadium Negotiating Team, Shortly After Which the Angels and Anaheim Announce a Deal for the Angels to Purchase the Stadium</u>

29.     Based on open source information, including Anaheim City Council meeting minutes, and interviews conducted throughout the course of this investigation, I learned additional information related to the Angels stadium deal, as follows.

30.     Shortly after the Angels terminated their stadium lease with Anaheim, the two parties began the process of negotiating a new lease. Anaheim's negotiating team consisted of the City Manager, City Attorney, City Planning Director, and a couple outside consultants.

31.     In June 2019, SIDHU attempted to unilaterally appoint himself to the city's negotiating team. SIDHU's move was met with resistance from two City Council members who questioned SIDHU's authority to unilaterally appoint himself and further questioned the transparency of such a move. The two dissenting Council members attempted to appoint themselves to the negotiating team, which would have prevented SIDHU's appointment from occurring at the time.

14

32.     Then, approximately one month later, in July 2019, the Anaheim City Council officially voted 5-2 to appoint SIDHU to Anaheim's negotiating team.  The City Council meeting during which the vote occurred was contentious, with the same two Council members voicing their concerns about SIDHU being part of the negotiating team.  I believe, based on my experience in this investigation, including Court-authorized Title III intercepted communications of CW2, a political consultant ("Political Consultant 1"),[19] and several Anaheim City Council members (including SIDHU), that SIDHU, along with CW2, Political Consultant 1, and others, wielded influence over the Anaheim City Council majority at this time.  As a result, I believe such influence may have been used to sway the City Council vote in favor of his appointment -- and only his appointment -- to the negotiating team.

33.     Shortly after SIDHU joined the negotiating team, on August 23, 2019, the Angels advised the Anaheim City Council that they preferred to purchase the land on which the stadium rested, rather than lease it.  Then, on September 24, 2019, the City Council agreed to negotiate a sale of the stadium property.

34.     On December 20, 2019, the Anaheim City Council held a special meeting that lasted over eight and a half hours.  The purpose of the meeting was to discuss the proposed sale of the stadium, during which representatives from Anaheim's negotiating team, the City Council, representatives from the Angels, and members of the public spoke.  Ultimately the City agreed to begin the land sale process at a starting price of $325 million.

35.     What followed after the December 20, 2019 City Council meeting was a months-long process of sales negotiations where the negotiating team, including SIDHU and Angels representatives, negotiated, among other things, the value of various community benefits the Angels were willing to provide in exchange for commensurate credits against the sales price of $325 million.

---

[19] Political Consultant 1 is a principal partner of a nationally known political and public affairs company.

36.    On September 29, 2020, the City Council convened a meeting where they voted on terms to finalize the sale of the stadium property to Moreno and the Angels (together referred to as "SRB").[20]  The terms included the following:

a.    Adjusting the purchase price from $325 million to $319,812,179 to "reflect land that the City will retain for a future fire station as well as the City's retention of the municipal water utility building adjacent to Katella Avenue."[21]

b.    SRB agreed to construct 466 affordable housing units valued at $123,677,843, which would be reflected as a credit at escrow.

c.    SRB agreed to construct and maintain a seven-acre Community Benefit Park valued at $46,233,094, which would be reflected as a credit at escrow.

37.    After deducting the value of the community benefits (the park and affordable housing listed above) to the overall purchase price ($319,812,179), the consideration due to the City of Anaheim at the close of escrow would be $149,901,242.  Escrow was anticipated to close in late 2021 or early 2022.  However, shortly after the Anaheim City Council approved the deal, members of the community (including certain members of the City Council) began to question the transparency and fairness of the deal, including whether the deal complied with the Surplus Land Act.

3.    The Stadium Deal Is Deemed to Have Violated the Surplus Land Act by the State of California

38.    On or about December 8, 2021, California notified Anaheim officials that the stadium deal violated the Surplus Land Act.  California's Surplus Land Act, Government Code Sections 52220 through 52234, generally requires that before selling any land, local government agencies must first offer it to affordable housing developers and have good-faith discussions of any eligible proposals for affordable housing."

---

[20] The City of Anaheim's agreement to sell the stadium was officially made between the City and SRB Management, LLC.

[21] According to https://www.anaheim.net/2142/View-City-Council-Meetings, last visited on January 25, 2022.

16

39.     Attorneys for the City of Anaheim argued that: the stadium property "was already tied up in a long-term lease and therefore didn't count as 'surplus'"; the City was already exclusively negotiating with the prospective buyer before a September 2019 deadline to be grandfathered under an earlier version of the law; and the sale was necessary to create economic opportunities, including the creation of jobs and new housing.[22]

40.     California ultimately rejected Anaheim's arguments in support of the stadium deal, explaining that not all of the land included in the deal was covered by the lease; therefore, any land not covered under the lease referenced in Anaheim's arguments could have been offered at public bid for affordable housing.  The State then offered several ways in which Anaheim could remedy the situation, including designating 80% of the property for housing and setting aside 40% of the total homes for lower-income families, putting the property out for bid and requiring at least 25% of the homes built be affordable, or declaring the land surplus and entertaining bids from affordable home developers.  A fourth remedy would allow Anaheim to proceed with the current stadium deal, but be subjected to a state-imposed fine of approximately $96 million.  On April 25, 2022, the City and State announced that they had reached agreement to proceed with the fourth remedy.[23]

####            4.     SIDHU Covertly, and with the Intent of Concealing from the Negotiating Team and the Public, Passed Privileged and Confidential Information to the Angels to Assist the Angels in Their Negotiations with Anaheim

41.      From in or around September 2019, when the City Council was discussing stadium appraisal figures during closed session meetings, until in or around September 2020, when Anaheim and the Angels agreed on terms, including final sale price and community benefits (discussed above), it appears that SIDHU, on at least two specific occasions, provided City-specific information to the Angels for use by the Angels in their negotiations with Anaheim.  Furthermore, SIDHU apparently did so in a covert fashion -- intentionally concealing his actions

---

[22] According to https://www.ocregister.com/2021/12/08/state-to-anaheim-angel-stadium-sale-violates-affordable-housing-law/, last visited on January 25, 2022.

[23] According to https://www.ocregister.com/2022/04/25/anaheim-state-to-announce-settlement-in-angel-stadium-sale-dispute/, last visited April 25, 2022.

from other members of the negotiation team -- I believe, in part, to conceal a Brown Act[24]

violation and avoid negative public perception.

42.     On September 24, 2019, the Anaheim City Council held their regularly scheduled

meeting.  According to the City Council agenda, the archives of which can be found on

www.anaheim.net, Closed Session Item #5 read, "CONFERENCE WITH REAL PROPERTY

NEGOTIATORS," and referenced the address of Angel Stadium.  The Closed Session item went

on to identify "Angels Baseball, LP; City of Anaheim" as the "Negotiating Parties" and "Price

and Terms" as the subject "Under Negotiation" in the Closed Session.

43.     In December 2019, approximately two months after the Closed Session discussed

above, Anaheim made the stadium appraisal report available to the public.  However, according

to CW2, after the September Closed Session meeting where the stadium appraisal is believed to

have been discussed, *but before the appraisal figures were made available to the public*, SIDHU

provided the appraisal figures to CW2 to be shared with representatives from the Angels.

44.     SIDHU's actions may have violated the Brown Act in that he knowingly provided

non-public information discussed during a Closed Session City Council meeting to CW2.  In

addition, SIDHU passed information on a real estate transaction, which was arguably one of the

largest real estate transactions in the City of Anaheim's history.  Furthermore, and as will be

discussed in more detail below, there is probable cause to believe that SIDHU knew his actions

were wrong because he has attempted to conceal those actions from an Orange County Grand

Jury (with the enlisted help of CW2).  I also believe that SIDHU's actions may have affected the

ruling of an Orange County Superior Court Judge presiding over a civil matter involving the sale

of the stadium.

---

[24] According to https://www.bbklaw.com/bbk/media/library/pdf/major-provisions-and-requirements-of-the-brown-act.pdf, last visited on January 28, 2022,  "The Ralph M. Brown Act is California's "sunshine" law for local government.  It is found in the California Government Code beginning at Section 54950.  In a nutshell, it requires local government business to be conducted at open and public meetings, except in certain limited situations.  With respect to Closed Sessions conducted by a legislative body, including local City Councils, "The Brown Act allows a legislative body during a meeting to convene a closed session in order to meet privately with its advisors on specifically enumerated topics…Examples of business which may be conducted in closed session include…real estate negotiations.""

45.    In addition to SIDHU's possible Brown Act violation discussed above, SIDHU also appeared to pass information, via CW2 and Political Consultant 1, to the Angels in an effort to assist the Angels during the stage of the negotiations where the two parties were negotiating community benefits.

46.    On July 21, 2020, while negotiations were ongoing, SIDHU sent an email from the SUBJECT ACCOUNT to CW2 and Political Consultant 1.  No member of the City negotiating team, aside from SIDHU, was included on the email.  The subject line of the email read, "4844-8343-9299.2 Key Issues - Stadium Transaction Agreements.docx."  Attached to the email was a Microsoft Word document titled the same as the subject line of the email ("the Key Issues document").  The email, which the FBI has obtained from CW2, also contains "Sent from my iPhone" in the body of the email itself.  Therefore, I believe SIDHU used the SUBJECT PHONE to send the email to CW2.  While it is possible SIDHU may have obtained a new phone between the date he sent this email and now, I nonetheless believe evidence may still be found on the SUBJECT PHONE because, based on my training and experience, I know that when individuals obtain new phones, it is common practice to have data transferred from their old phone to their new phone.

47.    The Key Issues document is approximately three pages in length and contains a table with two columns and approximately 10 rows.  The two column titles read "TOPIC" and "DISCUSSION ISSUES," respectively.  Each row contains a separate topic title, followed by bullet points addressing Anaheim's concerns in their negotiations with the Angels pertaining to the respective topics.

48.    In addition to the content of the Key Issues document, I have reviewed the following about its properties, which are contained within the document itself as well as by viewing its properties in Microsoft Word.  As a result, I have learned the following:

    a.    According to the "Summary" tab in the document's properties, the author of the document is "anaustin" and the company reflected in the "Summary" tab of properties is "Husch Blackwell LLP."  Husch Blackwell LLP is a law firm, which was named one of the top

19

law firms with sports practices on or about March 8, 2021. Furthermore, the law firm's website states that, "Practice leaders Kevin Kelley and Andrea Austin are currently advising the City of Anaheim in the sale of Angel Stadium to an owner affiliate of the Los Angeles Angels…"[25] I believe the author of the Key Issues document was Andrea Austin ("Austin") because the "Summary" tab in properties describes the author of the document as "anaustin." Based on the foregoing, I believe the Key Issues document was created by Austin in her representation of the City of Anaheim. The document at one point may have been subject to privilege, waivable only by the City of Anaheim and its negotiating team -- not unilaterally by SIDHU himself.

b. The header of the Key Issues document reads, "HB Draft 7/20/20." Based on the foregoing, I believe "HB" is an abbreviation for Husch Blackwell. Furthermore, I believe the document itself is not a final product because of the "Draft" reference in the header. Finally, I believe the date of the document mentioned in the header ("7/20/20") is notable because it is just one day before SIDHU emails the document to CW2 and Political Consultant 1.

c. According to quarterly lobbying reports filed with Anaheim by Political Consultant 1, beginning in early September 2020, Political Consultant 1 disclosed payments received from SRB for services rendered in support of SRB's stadium negotiations. Included in the disclosures were multiple contacts with Anaheim Council Members and public officials, including several with SIDHU himself. However, Political Consultant 1 did not appear to disclose this email contact with SIDHU during the same reporting period.[26]

49. Although CW2 explained that an elected official providing information to an opposing party in negotiations with the city is not without precedent -- explaining that sometimes such actions assist in the negotiation process -- the fact that SIDHU at the time was, and is still currently, attempting to conceal his actions from the City of Anaheim, as set out more fully below, and the public speaks to his state of mind.

---

[25] According to https://www.huschblackwell.com/inthenews/husch-blackwell-named-a-top-sports-law-firm, last visited on January 28, 2022.

[26] According to https://www.anaheim.net/5453/Lobbyist-Registry-Quarterly-Reports-of-A#FSB, last visited on April 9, 2022.

50.     Approximately two months after SIDHU emailed the Key Issues document from the SUBJECT ACCOUNT to CW2 and Political Consultant 1, the Anaheim City Council held their meeting on September 29, 2020, where they voted on the final terms of the stadium deal as outlined above.  Based on my review of the September 29, 2020 City Council meeting, which has been archived on Anaheim's website, I believe the meeting was conducted via teleconference due to Covid because there was only audio provided on Anaheim's website, and the following statement accompanied the meeting agenda on the website, "Pursuant to Executive Order N-29-20, please be advised that the Anaheim City Council will participate in this meeting telephonically."[27]  Due to the remote nature of the City Council meeting, I believe SIDHU may have used the SUBJECT PHONE and/or the SUBJECT ACCOUNT to communicate with parties regarding aspects of the stadium deal; therefore, I believe evidence relating to this scheme may exist on the SUBJECT PHONE and within the SUBJECT ACCOUNT.

51.     Based on the foregoing, I believe SIDHU knowingly provided confidential information intended for the sole use of Anaheim and its negotiating team to the Angels.  Furthermore, and as will be described in further detail below, I believe he did so covertly, with the intent of concealing his actions from the negotiating team and the public, for the purpose of assisting the Angels and himself at the expense of the City of Anaheim.[28]

---

[27] According to https://www.anaheim.net/2142/View-City-Council-Meetings, last visited on February 2, 2022.

[28] I believe SIDHU's actions outlined above (providing stadium appraisal figures to CW2 to be shared with the Angels and the Key Issues email/document) may have affected an Orange County Superior Court Judge's ruling in a civil matter brought by the Homeless Task Force of Orange County ("HTFOC"), which had alleged, among other things, that Anaheim had not been transparent in their negotiations with the Angels.  On or about March 21, 2022, the judge presiding over the matter issued a preliminary ruling against the HTFOC, stating that Anaheim had "substantially complied" with state laws and that discussions and decisions about the sale "were anything but secret and were fully vetted with the public." (According to https://www.ocregister.com/2022/03/21/angel-stadium-judge-wont-block-sale-over-residents-lawsuit/, last visited on April 13, 2022.).  On or about April 1, 2022, FBI Special Agents Joseph Nieblas and Trung Dang interviewed an attorney representing the HTFOC.  The attorney advised that despite having filed a public records act ("PRA") request with Anaheim, to include the production of email communications related to the stadium sale negotiations, Anaheim's response appeared incomplete, in part, because there were no emails that included SIDHU in the production.  I believe the Key Issues email/document would have likely fallen within the scope
*(footnote cont'd on next page)*

5.      SIDHU Has Attempted to Obstruct an Orange County Grand Jury Inquiry into the Angel Stadium Deal

52.     On December 17, 2021, CW2 notified the FBI of CW2's recent receipt of a letter from the Orange County Grand Jury (the "OC Grand Jury"). Shortly thereafter, CW2 provided the FBI with a copy of the OC Grand Jury letter. I have reviewed a copy of the letter. The letter is dated December 1, 2021, and is addressed to CW2. Stamped on the letter, in red, reads "CONFIDENTIAL." The letter reads as follows, "The 2021-2022 Orange County Grand Jury is seeking information about the purchase and sale of Angel Stadium of Anaheim. Members of the Grand Jury would like to interview you in our office located at 700 Civic Center Drive West, Santa Ana, CA 92701. Please allow 90 minutes for the interview." The letter is then signed by the Foreperson of the OC Grand Jury. Below the signature of the Foreperson is an admonition that reads, "This correspondence and your response to it are completely confidential. This means that the contents of this letter, the subject matter, and your response are not to be released to the public or shared with anyone not directly involved in responding to this letter, without prior authorization of the Orange County Superior Court."

53.     CW2's access to SIDHU had waned in the months prior to receiving the OC Grand Jury letter, in part due to investigative actions the FBI took in furtherance of this investigation. Upon receiving the OC Grand Jury letter, CW2, at the direction of the FBI, reestablished contact with SIDHU. As a result, CW2 and SIDHU met on January 12, 2022 to discuss the OC Grand Jury, among other matters. The FBI provided CW2 with a recording device and the meeting was subsequently recorded by CW2. During the meeting, the following conversation between SIDHU ("HS") and CW2 occurred: [29]

---

of HTFOC's PRA request, but that was nonetheless not turned over to HTFOC. Furthermore, I believe such information and documents would have been pertinent to the HTFOC, and possibly the judge presiding over the matter.

[29] Descriptions and draft transcriptions of recorded conversations are summaries based on my and/or other FBI employees' review of the recordings, understanding of the context of the recorded conversations, knowledge of this case, and my training and experience. These descriptions are not based on a final, verbatim transcript. At times, I have placed my understanding of what is being said in brackets within the quotes. Since this affidavit is offered for a limited purpose, I have not included a description of every topic discussed or every statement contained in a recorded conversation.

HS:      So, who else got called on, is [Political Consultant 1] also got called on the, ah, on [the OC Grand Jury]?

CW2:    That's why I'm trying to meet with [Political Consultant 1] tomorrow, because, so, I got, I'm sure the same letter?

HS:      Yeah.

CW2:    Yeah, so umm, I haven't talked to [Political Consultant 1] since the holidays. So we texted last week and said, "Hey we gotta catch up." And umm, so it actually went to the Chamber and so [Chamber Employee 1] and I got it. And I said, "Hey tell [Political Consultant 1] I gotta touch base with him on this." So we're touching base tomorrow at 2. Ah, [Angels Employee 1] from the Angels, the old attorney, he's --

HS:      [Angels Employee 1] from the Angels?

CW2:    Yeah, he wants to meet. Ah, just to catch up, but I said, you know, "Did you get a letter?" I don't know. I asked him something like that, and he said "Yeah."

HS:      So this is the [Angels Employee 1] that used to be the previous attorney?

CW2:    Yeah. Right.

HS:      Because they also got it.

54.    Based on my training and experience, including my knowledge of this investigation, I believe SIDHU and CW2 were discussing the OC Grand Jury investigation, and specifically that SIDHU wanted to know who else had received a letter from the OC Grand Jury. A short time later, during the same recorded meeting, the following exchange occurred:

CW2:    Mine is, I don't know, obviously somebody, if it's you, me, [Political Consultant 1], and Angels, somebody saying ok, what information did they share? And so like I'm worried. I don't wanna lie.

HS:      Right.

CW2:   Because I'm afraid if I lie, and they have something, and then all of a
       sudden we're in their crosshairs.

HS:    Right.

CW2:   For lying to a grand jury. So like you know, appraisal information, any of
       that. Is any of that in your text or emails? Of you gave us kind of the
       ranges of the appraisal.

HS:    I have not given any of the emails that was going on between you, me, and
       [Political Consultant 1].

CW2:   Ok.

HS:    Nothing at all.

CW2:   Ok.

HS:    So it's not there.

CW2:   Ok.

HS:    So that, because remember, nothing came from the city hall going to you
       right off.

CW2:   Ok. Right, right.

HS:    It was my private emails on even my text and all that with you, I erased
       everything.[30]

CW2:   Ok.

---

[30] I believe this statement by SIDHU to be a reference to SIDHU's attempt to delete
certain emails and text messages pertaining to the Angels Stadium deal. Furthermore, I believe
this reference to be related to emails contained in the SUBJECT ACCOUNT and text messages
contained on the SUBJECT PHONE. I believe this statement illustrates SIDHU's practice of
maintaining historical electronic communications for a period of time. Even if SIDHU did, in
fact, delete these items as he told CW2 (relatedly, I believe it is also possible SIDHU may have
been lying to CW2 in an effort to lull CW2 into a false sense of security before CW2 provided a
statement to the OC Grand Jury): (1) there may have been additional items related to the Target
Offenses (including 18 U.S.C. §§ 1346 and 666) that SIDHU may have overlooked and thus
failed to delete, and therefore are still maintained in the SUBJECT ACCOUNT and on the
SUBJECT PHONE; and (2) such deletions (and an absence of such communications) would
corroborate SIDHU's commission of the Target Offenses (including 18 U.S.C. §§ 1346, 666, and
1503, as described further below).

HS:     So, if you, if they ever say that you meet with the mayor, just say, "Yeah, occasionally we talked because I wanted to know the economic development."

CW2:    Yeah.

HS:     "This is part of the project that the Chamber was working on."

55.     Based on my training and experience, including my knowledge of this investigation to date, I believe CW2 was expressing his/her concern to SIDHU about being questioned before the OC Grand Jury, specifically about CW2's knowledge and/or involvement in receiving information from SIDHU and subsequently passing said information onto the Angels during negotiations.  Rather than simply advising that CW2 tell the truth to the OC Grand Jury, SIDHU instead reassured CW2 that, "I have not given any of the emails that was going on between you, me, and [Political Consultant 1]."  SIDHU further explained that "nothing came from the city hall going to you… [i]t was my private emails on even my text and all that with you, I erased everything."  First, I believe SIDHU's reference to "any of the emails" between him, CW2, and Political Consultant 1 to be a reference, in part, to the Key Issues document email discussed above -- an email that SIDHU provided to CW2 and Political Consultant 1 *during* stadium sale negotiations.  Second, I believe SIDHU's clarification that he used his private email (believed to be a reference to the SUBJECT ACCOUNT) and that "nothing came from the city hall" was his attempt at further reassuring CW2 that the OC Grand Jury would not be able to access evidence (e.g., via a public records act request) that he was covertly passing information, through CW2 and Political Consultant 1, to the Angels during negotiations.  Finally, in case CW2 remained concerned, I believe SIDHU again attempted to reassure CW2 when he stated, "I erased everything."

56.     Throughout their conversation, and as was illustrated above, SIDHU appeared concerned about the OC Grand Jury uncovering the fact that SIDHU had passed information to the Angels, via CW2, during stadium sale negotiations.  When asked why SIDHU would be concerned with the OC Grand Jury uncovering such facts, CW2 advised that the public

perception of such actions would negatively affect SIDHU and could potentially prevent the stadium deal between Anaheim and the Angels from being finalized. SIDHU's concern appeared to be significant, to the point of instructing CW2 to lie to the OC Grand Jury, as was illustrated in the same recorded conversation, during which the following exchange occurred:

> HS: So, so when you, again your key thing is, when, when they talk to you about this basically say, "Yeah I talked with [SIDHU], about, you know, during the time of, not negotiations, but after the negotiations was done." And came back to city hall and he asked for the economic development and, we were, you know, we were there and supporting this.
>
> CW2: Mhmm
>
> HS: You know.
>
> CW2: The hard part, and I think what everybody's freaked out about is people know we had meetings. And people may have been watching us. So, you know, to lie, is probably not good. I think we just, you know, the meetings occurred.
>
> HS: Right.

57. Based on my training and experience, including my knowledge of this investigation to date, I believe SIDHU was coaching CW2 on what to say to the OC Grand Jury. Specifically, SIDHU appeared to be instructing CW2 to (1) tell the OC Grand Jury that CW2 had met with SIDHU about the Angels deal *after* the negotiations between Angels and Anaheim had ended and (2) conceal the fact that CW2 and SIDHU had discussed negotiations while they were ongoing. After SIDHU gave these instructions to CW2, CW2 again expressed his/her concern about lying to the OC Grand Jury, further stating that, in fact, the meetings that SIDHU had previously coached CW2 to tell the OC Grand Jury had occurred *after* negotiations actually occurred *during* negotiations. SIDHU appeared to confirm CW2's statement when he replied, "Right."

58.     After SIDHU advised CW2 that he (SIDHU) had concealed and/or destroyed evidence related to information possibly being sought by the OC Grand Jury, and after SIDHU instructed CW2 to lie to the OC Grand Jury, SIDHU then appeared to task CW2 with sharing information CW2 was likely to glean from the OC Grand Jury so that SIDHU could prepare for his own Grand Jury testimony, as indicated in the below exchange that took place during the same recorded conversation:

> HS:     So, what you want to do is write down, after your meeting is over, I need you to write those questions down yourself.
>
> CW2:    Ok.
>
> HS:     Right after you come home.
>
> CW2:    Ok.
>
> HS:     Write it down.
>
> CW2:    Ok.
>
> HS:     Because then, then we'll meet and at least you'll let me know what happened.

59.     Based on my training and experience, including my knowledge of this investigation to date, I believe there are several motivating factors driving SIDHU to go to such lengths (i.e., concealing and/or destroying evidence and instructing CW2 to make false statements to the grand jury), including maintaining his reputation in Anaheim, and ensuring his reelection in November 2022 is unaffected by any revelation of impropriety.  I also believe, based on recorded conversations conducted between CW2 and SIDHU, and as illustrated below, that another motivating factor was SIDHU's intention to solicit monetary compensation from an individual, in the form of campaign contributions, in exchange for pushing the stadium deal through on more favorable terms for the Angels.

60.     On October 29, 2021, CW2 had an in-person meeting with SIDHU, which was surreptitiously recorded at the direction of the FBI.  During the recorded conversation, the two discussed several matters, including SIDHU's plan to solicit campaign contributions from a

representative of the Angels organization ("Angels Representative 1").[31]  During that portion of their discussion, SIDHU made the following statement:

> HS: Yeah.  And here's the thing, if the Angels deal goes through, by the end of the year, then I'm gonna ask ah, [Angels Representative 1].  Right?  I'll just call [Angels Representative 1] up and say, "[Angels Representative 1], we need, we need at least half a million dollars of support for you to come with the IEs."[32]

61. Then, on December 6, 2021, CW2 once again met with SIDHU in person and conducted a surreptitiously recorded conversation, where SIDHU made the following statement of his intent to solicit campaign funds from Angels Representative 1:

> HS: Because I, I've said, you gotta at least, minimum of a million dollars to come up with my election.  They have to.  And of course, you know, if Disney, I mean, if Angels [stadium sale] would conclude next year is approved hopefully, we'll push for them at least have a million dollars.  You know, for [Angels Representative 1] to say "no" is bad, for them not to say no on that.

62. Then on or about January 24, 2022, CW2 and SIDHU had a phone conversation. This call was not recorded due to a technical malfunction.  CW2 advised that during the phone call, SIDHU told CW2 that he (SIDHU) intended to revise his request to Angels Representative 1 for campaign contributions from $500,000 to $1,000,000.  SIDHU told CW2, several times during the phone call, that he needed the stadium deal to go through before he could ask Angels Representative 1 for money.  CW2 opined that SIDHU's motivation in pushing the stadium sale

---

[31] Angels Representative 1 holds a senior position within the Angels organization.

[32] According to www.fppc.ca.gov, last visited on March 24, 2022, an independent expenditure "is a payment for a communication that expressly advocates the election or defeat of a clearly identified California state or local candidate or the qualification, passage, or defeat of a clearly identified state or local ballot measure, and the communication is not coordinated with or 'made at the behest' of the affected candidate or committee."  I believe the "IE" referenced in this communication refers to this independent expenditure.

was solely for the benefit of his reelection campaign. CW2 advised that if SIDHU was successful in securing a $1,000,000 commitment from Angels Representative 1, such a commitment would likely be in the form of Political Action Committee ("PAC") independent expenditures, examples of which would be mailers and television ads supporting SIDHU and/or attacking his opponents, paid for by Angels Representative 1.

     63.    At the direction of the FBI, CW2 attempted to follow up on the January 24, 2022 phone call. As a result, CW2 and SIDHU had a telephone conversation on January 28, 2022, which was successfully recorded. During that recorded telephone call, in addition to SIDHU once again appearing to coach CW2 to mislead the OC Grand Jury, the following conversation occurred:

    CW2:  Um, you had mentioned you wanted to try to get [Angels Representative 1] a higher level. Up to the million dollar level. Do you think [Angels Representative 1] go there? Do you have a reason to think [Angels Representative 1] go higher? [Angels Representative 1]'s never gone there before.

    HS:  Gone? Gone where?

    CW2:  To, to a million, for re-election. To help with the PACs.

    HS:  At least, you know, you should shoot for 3 million total?

    CW2:  Okay.

    HS:  You should. Because I am hoping to get at least a million from I'm going to be pushing it. [Angels Representative 1] actually asked me. [Angels Representative 1] said, "What can I do for your election?" I said, "Let me finish your deal first, and then we'll talk about that."

    CW2:  Ok.

    HS:  So I'm going to be asking for a million dollars from [Angels Representative 1].

64.     Based on my training and experience, including my knowledge of this investigation to date, I believe SIDHU illustrated his intent to solicit campaign contributions, in the amount of $1,000,000, from Angels Representative 1, in exchange for performing official acts intended to finalize the stadium sale for the Angels, despite the State of California's threat to levy a multi-million dollar fine should Anaheim move forward with the deal in its current state. I am unaware of any information confirming that Angels Representative 1 has, in fact, been solicited by SIDHU in the manner described herein, or is otherwise aware of SIDHU's stated intent to do so.

6.     <u>SIDHU is Alerted to the Existence of a Federal Investigation Into the Stadium Deal by CW2</u>

65.     On February 8, 2022, at the direction of the FBI, CW2 met with SIDHU in person where the two discussed potential state and federal government investigations into the stadium sale. Prior to the meeting, the FBI provided a document to CW2 to be shown to SIDHU. The document was a one-page document, made to appear like an attachment to a Federal Grand Jury Subpoena seeking communications related to the sale of the Angel Stadium ("the FGJS Attachment"). The FGJS Attachment was not an actual attachment to a subpoena. In other words, the FGJS Attachment was part of a ruse. CW2 was instructed to show SIDHU the FGJS Attachment and tell SIDHU that CW2 had been served with a subpoena by the FBI. The meeting was surreptitiously recorded by CW2 at the direction of the FBI.

66.     Near the beginning of the meeting, CW2, as directed by the FBI, showed SIDHU the FGJS Attachment and informed SIDHU that, "I got served," which then prompted the two of them to discuss the ongoing FBI investigation into Anaheim, specifically the Angels Stadium deal. At various times, SIDHU questioned whether the federal government was monitoring phones and/or emails, even inquiring whether the government would need to obtain an "okay from the court" to do so.

67.     As the meeting progressed, and their conversation regarding the federal investigation continued, the following exchange occurred:

HS:     No, that I don't know. All I was told was that the, the [Anaheim Employee
        1][33] was asked to come. He was served. You know, and ah, he was served
        to appear in front of the federal grand jury. Right? Is that what they said to
        you also? Appear in front of the grand jury. Let me ask you the thing is all
        this thing is only valid unless you guys got paid for this. Right?

CW2:    No, did not.

HS:     You didn't get paid?

CW2:    No.

HS:     So

CW2:    So.

HS:     So the thing is only time that fraud is involved, in my opinion, Todd. That
        if there's a money exchanged. Right?

CW2:    That's my understanding. I mean, that's what we always said I didn't you
        know, with [a former Anaheim employee], you know, I didn't want to hide
        that we were talking to the Angels and things. Right? [Anaheim Employee
        1] knew.

HS:     Right.

CW2:    I mean we all work together on all these terms we did and tried to help
        bring it home. I agree with you but they definitely know of conversations.
        Know of emails, know of text. So they for the lawsuit, when with the city
        thing? Did you ever look at what all they got? And what documents that
        they pulled off your emails and other people's emails?

HS:     I, most of the emails, I erased it.

68.     Based on my training and experience, including my knowledge of this
investigation to date, I believe SIDHU reaffirmed that he deleted relevant communications
regarding the stadium sale to thwart one or more investigations when he said: "I, most of the

---

[33] Anaheim Employee 1 was an employee of the City of Anaheim.

emails, I erased it." While the February 2022 interaction put SIDHU on explicit notice of a federal grand jury investigation as of that date, I submit that the interaction demonstrates that SIDHU was already aware of the existence of a federal grand jury investigation and was in communication with other Anaheim government personnel about the investigation. SIDHU references a grand jury subpoena issued to Anaheim Employee 1; the subpoena had been served on Anaheim Employee 1 on February 7, 2022, the day before CW2's meeting with SIDHU. Moreover, though SIDHU did not discuss erasing or deleting any messages or communications after being told about/reviewing the ruse federal grand jury subpoena attachment during the February 2022 meeting, I believe this reaffirmation and his prior statements -- regarding having deleted or erased sensitive communications being sought by the OC Grand Jury investigation (described above) -- indicates that he may have done the same with respect to the federal investigation. Moreover, I submit that SIDHU had ample motivation to continue to violate the Target Offenses following the February 2022 meeting -- both in continuing to hide evidence, and in ensuring that his similar prior acts were not discovered -- given that the superior court trial and substantial portions of the pretrial litigation in the HTFOC lawsuit post-dated that meeting, along with the April 25 announcement of the $96 million settlement between the City of Anaheim and the California Department of Justice and the preceding discussions or related investigation into the stadium sale. Thus, although I submit that there is probable cause that evidence of SIDHU's prior deletion of evidence and related violations of the Target Offenses will be found from the searches requested herein, I also submit that there is probable cause to believe that evidence of further violations of the Target Offenses post-dating the February 8, 2022 meeting may be found, such as acts of deletion, concealment, or falsification of evidence.[34]

---

[34] SIDHU and CW2 continued to discuss the federal investigation and speculate as to what investigators were seeking, and also, at times, discuss whether their conduct constituted a violation of law, as evidenced by statements like: "So the thing is only time that fraud is involved, in my opinion, Todd. That if there's a money exchanged. Right?" Regardless, SIDHU's statements regarding having deleted communications sought during investigations illustrates, at the very least, an intent to conceal actions related to the stadium negotiations.

## V.     TRAINING AND EXPERIENCE ON DIGITAL DEVICES[35]

69.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.     Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.     Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

---

[35] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

  c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it. For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

  d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions. Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed. Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

 70. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

  a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction. Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above. Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

  b. Digital devices capable of storing multiple gigabytes are now commonplace. As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

 71. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

      a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

      b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

      c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress SIDHU's thumb and/or fingers on the device; and (2) hold the device in front of SIDHU's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

72.    Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI.  TRAINING AND EXPERIENCE ON EMAIL ACCOUNTS

73.    In my training and experience, I have learned that providers of email and/or social media services offer a variety of online services to the public.  Providers, like the PROVIDER, allow subscribers to obtain accounts like the SUBJECT ACCOUNT.  Subscribers obtain an account by registering with the provider.  During the registration process, providers generally ask their subscribers to provide certain personal identifying information when registering for an email or social media account.  Such information can include the subscriber's full name, physical

address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). Some providers also maintain a record of changes that are made to the information provided in subscriber records, such as to any other email addresses or phone numbers supplied in subscriber records. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of an account.

74. Therefore, the computers of the PROVIDER are likely to contain stored electronic communications and information concerning subscribers and their use of the PROVIDER's services, such as account access information, email or message transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of a SUBJECT ACCOUNT.

75. A subscriber of the PROVIDER can also store with the PROVIDER files in addition to emails or other messages, such as address books, contact or buddy lists, groups, social network links, calendar data, pictures or videos (other than ones attached to emails), notes, and other files, on servers maintained and/or owned by the PROVIDER. In my training and experience, evidence of who was using an account may be found in such information.

76. In my training and experience, email and social media providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of login (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email and social media providers often have records of the Internet Protocol ("IP") address used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use

an IP address, IP address information can help to identify which computers or other devices were used to access the SUBJECT ACCOUNT.

77.     In my training and experience, email and social media account users will sometimes communicate directly with the service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Providers of emails and social media services typically retain records about such communications, including records of contacts between the user and the provider's support services, as well records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the user(s) of the SUBJECT ACCOUNT.

78.     I know from my training and experience that the complete contents of an account may be important to establishing the actual user who has dominion and control of that account at a given time. Accounts may be registered in false names or screen names from anywhere in the world with little to no verification by the service provider. They may also be used by multiple people. Given the ease with which accounts may be created under aliases, and the rarity with which law enforcement has eyewitness testimony about a defendant's use of an account, investigators often have to rely on circumstantial evidence to show that an individual was the actual user of a particular account. Only by piecing together information contained in the contents of an account may an investigator establish who the actual user of an account was. Often those pieces will come from a time period before the account was used in the criminal activity. Limiting the scope of the search would, in some instances, prevent the government from identifying the true user of the account and, in other instances, may not provide a defendant with sufficient information to identify other users of the account. Therefore, the contents of a given account, including the email addresses or account identifiers and messages sent to that account, often provides important evidence regarding the actual user's dominion and control of that account. For the purpose of searching for content demonstrating the actual user(s) of the SUBJECT ACCOUNT, I am requesting a warrant requiring the PROVIDER to turn over all

information associated with the SUBJECT ACCOUNT with the date restriction included in Attachment B for review by the search team.

79.     Relatedly, the government must be allowed to determine whether other individuals had access to the SUBJECT ACCOUNT.  If the government were constrained to review only a small subsection of an account, that small subsection might give the misleading impression that only a single user had access to the account.

80.     I also know based on my training and experience that criminals discussing their criminal activity may use slang, short forms (abbreviated words or phrases such as "lol" to express "laugh out loud"), or codewords (which require entire strings or series of conversations to determine their true meaning) when discussing their crimes.  They can also discuss aspects of the crime without specifically mentioning the crime involved.  In the electronic world, it is even possible to use pictures, images and emoticons (images used to express a concept or idea such as a happy face inserted into the content of a message or the manipulation and combination of keys on the computer keyboard to convey an idea, such as the use of a colon and parenthesis :) to convey a smile or agreement) to discuss matters.  "Keyword searches" would not account for any of these possibilities, so actual review of the contents of an account by law enforcement personnel with information regarding the identified criminal activity, subject to the search procedures set forth in Attachment B, is necessary to find all relevant evidence within the account.

81.     This application seeks a warrant to search all responsive records and information under the control of the PROVIDER, which is subject to the jurisdiction of this court, regardless of where the PROVIDER has chosen to store such information.

82.     As set forth in Attachment B, I am requesting a warrant that permits the search team to keep the original production from the PROVIDER, under seal, until the investigation is completed and, if a case is brought, that case is completed through disposition, trial, appeal, or collateral proceeding.

a. I make that request because I believe it might be impossible for a provider to authenticate information taken from the SUBJECT ACCOUNT as its business record without the original production to examine. Even if the provider kept an original copy at the time of production (against which it could compare against the results of the search at the time of trial), the government cannot compel the provider to keep a copy for the entire pendency of the investigation and/or case. If the original production is destroyed, it may be impossible for the provider to examine a particular document found by the search team and confirm that it was a business record of the provider taken from the SUBJECT ACCOUNT.

b. I also know from my training and experience that many accounts are purged as part of the ordinary course of business by providers. For example, if an account is not accessed within a specified time period, it -- and its contents -- may be deleted. As a consequence, there is a risk that the only record of the contents of an account might be the production that a provider makes to the government, for example, if a defendant is incarcerated and does not (perhaps cannot) access his or her account. Preserving evidence, therefore, would ensure that the government can satisfy its Brady obligations and give the defendant access to evidence that might be used in his or her defense.

///

///

///

## VII. <u>CONCLUSION</u>

83. Based on the above, I submit that there is probable cause to believe that evidence of the Target Offenses will likely be found in the SUBJECT ACCOUNT, SUBJECT PHONE, SUBJECT AIRCRAFT, and the person of SIDHU.

/s/
_____
BRIAN C. ADKINS, Special Agent
FEDERAL BUREAU OF
INVESTIGATION

Attested to by the applicant in accordance with the
requirements of <u>Fed. R. Crim. P. 4.1</u> by telephone
on this <u>12</u>th day of May, 2022.

**DOUGLAS F. McCORMICK**
_____
HONORABLE DOUGLAS F. MCCORMICK
UNITED STATES MAGISTRATE JUDGE

**ATTACHMENT A-2**

**SUBJECT AIRCRAFT TO BE SEARCHED**





The SUBJECT AIRCRAFT is a 2004 yellow-colored Robinson Helicopter, model R44 Clipper II, with Pop Out Floats, stripes down the side, bearing serial number 10277 and registration number N277MC.

## ATTACHMENT B-2

**I.**     **ITEMS TO BE SEIZED**

1.     The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), and 18 U.S.C. § 1001 (false statements), namely:

    a.     Documentation regarding SIDHU's purchase, maintenance (including storage), and use of the SUBJECT AIRCRAFT, including:

        i.     Bill of sale,

        ii.     Registration information (including physical FAA certificate of registration),

        iii.     Sales tax information,

        iv.     Flight logs,

        v.     Hangar rental information,

        vi.     Communications regarding the SUBJECT AIRCRAFT (to include mails, memos, letters, and facsimiles) between SIDHU and/or his representatives and the FAA, the State of California, the State of Arizona, the AZ Resident, hangar operators, and any other individual or entity involved in the purchase, registration, and maintenance of the SUBJECT AIRCRAFT.

    b.     Any materials documenting or otherwise referring to SIDHU's place(s) of residence between October 2020 and the present, to include materials that falsely refer to SIDHU's place of residence.